# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JESSICA SALBERG,            )
                            )
        Plaintiff,  )  Civil Action No. 11-175 Erie
                            )
    v.                       )
                            )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security,  )
                            )
        Defendant.  )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

### I.    INTRODUCTION

Jessica Salberg ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* Plaintiff filed her application on February 17, 2009, alleging disability since December 8, 2008 due to various blood disorders, anxiety, depression, migraines and diabetes (AR 127-133; 150; 155 ).[1] Her application was denied (AR 53-57), and following a hearing held on October 5, 2010 (AR 23-50), the administrative law judge ("ALJ") issued his decision denying benefits to Plaintiff on October 21, 2010 (AR 8-18).

Plaintiff's request for review by the Appeals Council was denied (AR 1-3), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision, and presently pending before the Court are the parties' cross-motions for summary judgment. For the following reasons, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.

---

[1] References to the administrative record [ECF No. 5], will be designated by the citation "(AR ___)".

1

## II. BACKGROUND

Plaintiff was 30 years old on the date of the ALJ's decision (AR 16; 162). She has a high school education, completed three years of college, and has past relevant work experience as a direct support specialist and a home rehabilitation worker (AR 28; 156; 162).

Plaintiff received medical treatment from Michael Hall, M.D., her primary care physician, from May 2005 through April 2010 (AR 213-229; 349-366). On May 10, 2005, prior to her alleged disability onset date, Plaintiff reported that she had been doing "pretty well" with respect to her headaches "until about 2 months ago" (AR 223). She reported that she suffered from two to three headaches per week causing nausea, lightheadedness, shakiness and irritability (AR 223). Her physical examination was unremarkable, and Dr. Hall diagnosed her with migraine headaches and malaise, and prescribed medications (AR 223).

On July 8, 2005, Plaintiff presented with a migraine headache, but reported that she had been "doing well" over the summer (AR 222). She was diagnosed with migraine headaches, and Dr. Hall continued her medications, noting that clonazepam was the only drug that worked for her symptoms (AR 222). In September 2005 and December 2005 Plaintiff was treated for hypoglycemia and depression (AR 220-221).

Plaintiff returned to Dr. Hall on March 20, 2006 and reported "trouble with migraines" (AR 219). Her physical examination showed no neurologic abnormalities, but there was mild tenderness found in her posterior neck area (AR 219). Dr. Hall diagnosed her with migraine headaches and recommended she see a chiropractor (AR 219). She was referred to a headache clinic and prescribed Topamax (AR 219). Dr. Hall reported that Plaintiff had been prescribed a variety of medications which had not improved her symptoms (AR 219). In July 2006 however, Plaintiff reported that her headaches were "tolerable", and no headache complaints were noted at her December 2006 office visit (AR 217-218).

On May 7, 2007, Plaintiff returned to Dr. Hall for a pre-employment physical and complained of panic attacks (AR 216). Her physical examination was unremarkable and Dr. Hall found Plaintiff was "okay to work" (AR 216). On October 4, 2007, Plaintiff complained of abdominal pain and was prescribed Protonix (AR 215). When seen by Dr. Hall on November 1,

2

2007, Plaintiff reported that Protonix had been effective in relieving her abdominal pain (AR 214). She was found however, to have lupus anticoagulant[2] and was prescribed Plavix (AR 214).

Plaintiff returned to Dr. Hall on May 30, 2008 and reported that she was doing well on her medications (AR 229). Plaintiff stated that she was active and working in a group home (AR 229). Her physical examination revealed no abnormalities (AR 229). She was assessed with hyperlipidemia, lupus anticoagulant, GERD and impaired glucose tolerance ("IGT). Dr. Hall continued her medication regimen (AR 229).

On December 8, 2008, Plaintiff reported that she was pregnant and had "major problems dealing with the situation" (AR 227). She further reported that she was anxious, emotional, unfocused and forgetful, and claimed she was unable to work (AR 227). Dr. Hall recommended counseling and prescribed Celexa (AR 227).

Plaintiff returned to Dr. Hall on December 30, 2008 and reported that she was "doing better with Celexa and counseling" (AR 226). She complained of hyperglycemic episodes, and Dr. Hall recommended that she follow a low carbohydrate diet and eat more frequently (AR 226). Her physical examination was unremarkable (AR 226). Dr. Hall recommended Plaintiff continue taking Celexa and remain off work until February 1, 2009 (AR 226).

Plaintiff was seen by Jagit Tandon, M.D., a hematologist, for her blood disorder on February 17, 2009 (AR 381). Plaintiff was 20 weeks pregnant and complained of headaches, occasional nausea, fatigue, occasional dizziness, and leg cramps (AR 381).

On March 2, 2009, Plaintiff returned to Dr. Hall and reported that she was doing well on her medications and had no headache complaints (AR 224). Dr. Hall continued her on Celexa (AR 224). Plaintiff was seen by Dr. Tandon on March 16, 2009, and complained of leg cramps, but denied any other symptoms (AR 380). On April 16, 2009, Plaintiff reported increased joint pain (AR 378).

Plaintiff completed a questionnaire with respect to her pain on April 27, 2009 (AR 187-188). Plaintiff reported that her migraine headache pain began approximately five to six years

---

[2] Lupus anticoagulants are antibodies against substances in the lining of cells that prevent blood clotting. *See* http://www.nlm.nih.gov/medlineplus/ency/articla/000547.htm.

3

prior (AR 187). She described her pain as a sharp, shooting, stabbing pain that originated on the side of her head at the temporal lobe, but frequently radiated to the frontal lobe (AR 187). She claimed that her pain varied and was unpredictable, and that she suffered from two to three migraine headaches per week, lasting from two to four hours in duration, and at times, lasting up to twenty-four hours (AR 187). Plaintiff stated she was not taking medication at that time due to her pregnancy, but had previously been prescribed clonazepam and vicodin (AR 188). She indicated that when she was able to take medication, it was not always helpful in relieving her pain (AR 188).

Plaintiff returned to Dr. Hall on May 4, 2009, and reported doing well on citalopram, but complained of increased reflux symptoms (AR 360). Plaintiff had no headache complaints and her physical examination was unremarkable (AR 360).

Plaintiff received chiropractic manipulation therapy from Ronald Rolley, D.C., from May 4, 2009 through May 29, 2009 (AR 270-272). At her initial evaluation, Plaintiff presented with a migraine headache, mid back pain, low back pain, and complained of increased headache and neck pain (AR 270). Her physical examinations at each visit revealed tenderness and muscle spasms in her cervical, thoracic and lumbar spine (AR 270-272).

On June 1, 2009, Plaintiff underwent a consultative examination performed by Emmanuel Hipolito, M.D. (AR 274-306). Plaintiff was eight months pregnant and reported she was "doing well" with her pregnancy (AR 274). She stated that she stopped working on December 8, 2008 due to lupus, diabetes, depression, anxiety, migraines and her pregnancy (AR 274). Plaintiff complained of headaches, fainting spells, chest pain, dizziness, lightheadedness, leg pain, back pain, generalized weakness, joint pains, anxiety and depression (AR 275). She stated she was able to care for her personal needs (AR 277). She further stated that she occasionally shopped, did the laundry, cooked, made the bed, climbed stairs, drove, and visited with friends and neighbors (AR 277). Dr. Hipolito found no abnormalities on physical examination (AR 277-278). He diagnosed Plaintiff with diabetes without sequela, depression and anxiety, neuropathy, and probable celiac disease (AR 279).

Dr. Hipolito completed a medical source statement and opined that Plaintiff could lift and carry up to ten pounds frequently, stand and walk four hours in an 8-hour work day due to her pregnancy, and had no limitations in sitting (AR 286). He further opined that she was limited with respect to pushing and pulling activities, could perform occasional postural movements, and required environmental restrictions (AR 287).

On June 24, 2009, Gregory Mortimer, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could perform a limited range of light work (AR 404-410). Dr. Moritmer found that Plaintiff could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and/or walk at least two hours in an 8-hour workday; sit for about six hours in an 8-hour workday; and occasionally engage in postural activities (AR 405-406). Dr. Mortimer also concluded that Plaintiff should avoid exposure to temperature extremes and environmental hazards (AR 407). He observed that there was no evidence in the medical record that Plaintiff's migraine headaches had required physician intervention in the previous year (AR 410). He further observed that Plaintiff's aggressive treatment for her other impairments had generally been successful in controlling her symptoms (AR 410). Dr. Mortimer concluded that the limitations found by Dr. Hippolito were well supported by the evidence (AR 410).

On July 6, 2009 Plaintiff was seen by Dr. Hall and reported she was "doing well" (AR 358). Dr. Hall found that her reflux symptoms were under control with Protonix and her depression was stable (AR 358). She was diagnosed with pregnancy, GERD, history of depression and elevated blood sugars (AR 358). Plaintiff returned to Dr. Tandon on July 14, 2009 and had no complaints (AR 376).

On July 16, 2009, Paul Francis, Ph.D., performed a psychological evaluation of the Plaintiff (AR 329-340). Plaintiff reported a history of a blood clotting disorder, type two diabetes, migraine headaches, depression and anxiety (AR 329). On mental status examination, Dr. Francis reported that Plaintiff's attitude was comfortable and helpful, and her speech was normal and spontaneous (AR 331). Her mood fluctuated and her affect was mostly anxious, but it was appropriate to thought content and context (AR 331). She denied having any

hallucinations or suicidal thoughts (AR 331-332). Dr. Francis found her thought processes were rapid and spontaneous, her responses to questions were goal directed and relevant, and her memory was intact (AR 331). Plaintiff was able to interpret two out of three proverbs, and Dr. Francis found that she displayed better academic abilities rather than practical life abilities (AR 332).

Dr. Francis diagnosed Plaintiff with adjustment disorder with mixed anxiety and depression, and assessed her with a Global Assessment of Functioning ("GAF") score of 55 to 58[3] (AR 334). He noted that Plaintiff was able to shop, cook, clean and maintain her residence, pay her bills, do the laundry and take care of her personal health and hygiene (AR 335). She also got along with and maintained communications with her family and friends (AR 335). Dr. Francis further noted that Plaintiff acknowledged she was able to maintain a daily household routine, remember appointments and read (AR 335).

Dr. Francis completed a medical source statement with respect to Plaintiff's ability to perform work-related mental activities (AR 336-338). He found she had no limitations in understanding, remembering, and carrying out short, simple instructions or making judgments on simple work-related decisions (AR 337). He further found that she had only "slight to moderate" limitations in understanding, remembering and carrying out detailed instructions (AR 337). Finally, Dr. Francis concluded that Plaintiff would have only a slight impairment in interacting appropriately with co-workers and responding appropriately to work pressures and changes in a usual work setting (AR 337).

One month after her baby was born, Plaintiff returned to Dr. Hall on August 4, 2009 and reported that her headaches had returned, and that she experienced cramping in her hands, calves and feet at times (AR 355). Her physical examination was unremarkable and she was assessed

---

[3]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51 to 60 may have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., no friends, conflicts with peers or co-workers)." *Id*.

with migraines and leg cramping (AR 355). Dr. Hall recommended calcium and magnesium, prescribed amitriptyline, and referred Plaintiff for further metabolic testing (AR 355).

On August 11, 2009, Edward Zuckerman, Ph.D., a state agency reviewing psychologist, reviewed the evidence of record and concluded that Plaintiff did not have a severe mental impairment (AR 411). Dr. Zuckerman found that Plaintiff had no more than mild limitations in her activities of daily living and concentration, persistence and pace, and no limitations in social functioning (AR 421). Dr. Zuckerman accorded great weight to and adopted Dr. Francis' opinion (AR 423).

Plaintiff was seen by Dr. Tandon on September 28, 2009 and reported that she had been seen in the emergency room for complaints of chest pain and was referred for an overactive thyroid (AR 375). Plaintiff complained of fatigue but had no other complaints (AR 375).

Plaintiff was evaluated by Sarvesh Rajan, M.D., an endocrinologist, on October 13, 2009 for her hyperthyroidism (AR 356-357). Plaintiff was three months postpartum and complained of fatigue and dizziness, but denied any other symptoms (AR 356). On physical examination, Dr. Rajan reported that Plaintiff was overweight to obese, and her thyroid gland was mildly enlarged (AR 357). All other findings were normal (AR 357). Dr. Rajan diagnosed her with hyperthyroidism, type two diabetes, well controlled, high cholesterol, and obesity (AR 357).

On November 4, 2009, Plaintiff reported that she felt "somewhat tired" and had "some achiness" (AR 354). Dr. Hall reported that Plaintiff was doing well postpartum but had experienced some weight gain (AR 354). Her physical examination was normal (AR 354). Dr. Hall diagnosed Plaintiff with postpartum hyperthyroidism and arthralgias, with possible medication-related fatigue, and prescribed naprosyn (AR 354).

On December 18, 2009, Dr. Hall opined that Plaintiff could frequently lift and carry up to ten pounds, stand and walk less than two hours, and had no impairment in sitting (AR 342). Dr. Hall noted that Plaintiff experienced fatigue and moderate pain, required rest periods, and frequently needed to elevate her legs during an 8-hour workday (AR 342). He further opined that Plaintiff could stoop occasionally, but never climb, balance, kneel, crouch or crawl (AR

343). He found that Plaintiff should avoid exposure to heights, moving machinery and temperature extremes (AR 343).

Dr. Hall also completed a medical statement with respect to Plaintiff's pain (AR 344). He indicated that Plaintiff experienced the following symptoms due to chronic pain syndrome: loss of interest in all activities; appetite and sleep disturbances; crying spells; decreased energy; difficulty concentrating; and suicidal thoughts (AR 344). He opined that Plaintiff's pain caused her to be markedly limited in daily activities and social functioning, and also caused concentration, persistence and pace difficulties (AR 344).

Plaintiff returned to Dr. Hall on January 5, 2010 and reported that naprosyn caused stomach upset and that she continued to gain weight (AR 352). She also complained of fatigue (AR 352). Plaintiff's physical examination was normal (AR 352). Dr. Hall diagnosed her with hypothyroidism and myofascial pain syndrome and prescribed Mobic as needed (AR 352).

On February 24, 2010, Dr. Tandon opined that Plaintiff could occasionally lift and carry up to ten pounds, stand and walk less than two hours, and had no impairment in sitting (AR 346). Like Dr. Hall, Dr. Tandon noted that Plaintiff experienced fatigue and moderate pain, required rest periods, and frequently needed to elevate her legs during an 8-hour workday (AR 346). He further opined that Plaintiff could occasionally climb, balance, stoop and kneel, but never crouch or crawl (AR 347). He found that Plaintiff should avoid exposure to environmental hazards, heights, moving machinery and temperature extremes (AR 347). Dr. Tandon also completed a medical statement with respect to Plaintiff's pain (AR 348). He found that although Plaintiff suffered from moderate pain resulting in decreased energy, she had no limitations with respect to her daily activities, social functioning or concentration abilities (AR 348).

On March 31, 2010, Plaintiff was seen by Dr. Tandon and complained of fatigue, leg cramps, neck pain and dizziness (AR 373). Plaintiff also complained of having headaches two times per week (AR 373).

Plaintiff returned to Dr. Hall for follow-up on April 5, 2010 and reported "slight leg pain" over the winter but noted that she had not been active (AR 350). She stated that the Mobic helped her symptoms (AR 350). She denied any chest pains or shortness of breath, but reported

8

that her headaches had "become a problem" (AR 350). Physical examination revealed tenderness in her neck and upper back posteriorly and a slightly enlarged thyroid (AR 350). Plaintiff was diagnosed with headaches, arthralgias, elevated blood sugar, high cholesterol and hypothyroidism (AR 350). Dr. Hall recommended Plaintiff undergo a repeat thyroid scan with an endocrinologist, and referred her to Oksana Palatna, D.O., a neurologist, for her headache complaints (AR 350; 384). He increased her Mobic dosage and encouraged Plaintiff to work on her diet (AR 350).

On July 7, 2010, Plaintiff was seen by Dr. Tandon and complained of nausea, joint pain, bilateral numbness in her legs and hands, headaches, fatigue and dizziness (AR 370).

On July 16, 2010, Plaintiff was evaluated by Oksana Palatna, D.O., a neurologist, for her headache complaints (AR 384-386). Plaintiff reported that she had suffered from headaches since she was 18-years-old, and her symptoms had progressively worsened over the last several months (AR 384). Plaintiff stated that she suffered from two to three headaches per week accompanied by nausea, photosensitivity, and at times, bilateral hand and feet paresthesias (AR 384). Plaintiff also complained of constant fatigue and intermittent joint and muscle spasms (AR 385). Dr. Palatna noted that Plaintiff was overweight and experienced tightness in her neck at times, for which she recommended physical therapy or breast reduction (AR 384).

On physical examination, Dr. Palatna reported Plaintiff's mental status evaluation was normal (AR 385). Plaintiff's motor, sensory and cranial evaluations were also normal, except for some decreased sensation in her face bilaterally (AR 385). Plaintiff's gate was stable and she was able to perform tandem walking without difficulty (AR 386). Dr. Palatna assessed Plaintiff with classic migraine headaches with aura, and neck pain (AR 386). She referred Plaintiff for an MRI, prescribed Maxalt and Phenegren for abortive treatment, and increased her Elavil dosage for preventative treatment (AR 386). Dr. Palatna further recommended that Plaintiff take vitamin B2 and a magnesium supplement, keep a headache diary, and start physical therapy for her neck pain (AR 386).

Plaintiff was evaluated by Angelo Illuzzi, D.O., on July 15, 2010 for complaints of fatigue, weight gain, body aches, possible sleep apnea and snoring (AR 395). Plaintiff's physical

examination was essentially normal (AR 396-397). Dr. Illuzzi found that Plaintiff's history was suggestive of an underlying obstructive sleep apnea and recommended that she undergo a sleep study (AR 397). An MRI of the Plaintiff's brain dated July 22, 2010 was normal (AR 393).

On July 26, 2010, Dr. Palatna authored a letter summarizing Plaintiff's migraine headache history and treatment, and recommended that Plaintiff begin taking Maxalt in order to control her headaches (AR 383).

On August 31, 2010, Dr. Palatna provided a medical source statement regarding Plaintiff's headaches (AR 399). Dr. Palatna stated that Plaintiff suffered from migraine headaches with associated nausea, vomiting and photophobia (AR 399). She further indicated that Plaintiff's headaches occurred "several times a week" lasting for "several hours" and opined that Plaintiff was unable to work while she had a headache (AR 399). Dr. Palatna further opined that Plaintiff experienced moderate pain with respect to her migraine headaches, and that she had marked restrictions with respect to her daily activities and social functioning, and also had deficiencies in concentration, persistence and pace (AR 400).

Finally, on September 7, 2010, Dr. Hall provided a medical source statement regarding Plaintiff's headaches (AR 401). Like Dr. Palatna, Dr. Hall stated that Plaintiff suffered from migraine headaches with associated nausea, vomiting and photophobia (AR 401). Dr. Hall further stated that Plaintiff experienced headaches several times a week of several hours duration and would be unable to work while experiencing a headache (AR 401). Dr. Hall also opined that due to Plaintiff's diabetes, she could only work four hours per day, stand for fifteen minutes at a time, sit for thirty minutes at a time, lift ten pounds occasionally and five pounds frequently, and never balance (AR 402). Dr. Hall indicated that Plaintiff's pain caused marked restrictions with respect to her daily activities and social functioning, and caused deficiencies in concentration, persistence and pace (AR 403).

Plaintiff and Linda Dezack, a vocational expert, testified at the hearing held by the ALJ on October 5, 2010 (AR 23-50). Plaintiff testified that she lived with her mother and one-year old daughter (AR 31). She stated she stopped working in December 2008 due to problems with an autoimmune disorder which caused muscle aches and weakness (AR 31-32). Plaintiff

testified that she was able to care for her personal needs, and was able to perform "light chores" around the house, such as washing dishes, folding laundry and cooking simple meals (AR 32-33; 39-40). She indicated she was able to shop for groceries occasionally and enjoyed reading (AR 33-34). Plaintiff claimed she could only sit, stand or walk for fifteen to thirty minutes (AR 35-36). She indicated she could lift her twenty pound daughter, but it caused a strain on her neck, back and joints (AR 36). Plaintiff stated she had to lie down and rest twice a day and had to "constantly" elevate her feet in order to prevent blood clots (AR 36-37). Plaintiff indicated that she was on numerous medications which caused diarrhea, nausea, fatigue and dizziness (AR 38).

Plaintiff further testified that she experienced migraine headaches two to three times per week lasting for several hours at a time (AR 41). She claimed she sought emergency room treatment for a migraine headache one week prior to the administrative hearing (AR 42). Plaintiff testified that different medications had been ineffective in alleviating her headaches (AR 43). Plaintiff indicated that she also suffered from occasional numbness in her hand and feet attributable to either her diabetes or blood disorder (AR 44). Plaintiff stated that she took medication for depression but was not undergoing mental health treatment (AR 46).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was limited to unskilled sedentary work, except she was limited to lifting ten pounds occasionally rather than frequently (AR 48). The vocational expert testified that such an individual could perform the jobs of a charge account clerk, order clerk in the food and beverage industry, and an escort vehicle driver (AR 48).

Following the hearing, the ALJ issued a written decision finding that Plaintiff was not disabled within the meaning of the Act (AR 8-18). Her request for an appeal with the Appeals Council was denied, rendering the ALJ's decision the final decision of the Commissioner (AR 1-3). She subsequently filed this action.

### III. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

### IV. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. 20 C.F.R. § 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of

12

performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. § 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

The ALJ concluded that Plaintiff had the following severe impairments: hypercoagulate state, panic attacks, adjustment disorder, depression, anxiety, and anticardiotipin antibody syndrome, but determined at step three that she did not meet a listing (AR 10-13). The ALJ found that Plaintiff had the residual functional capacity to perform unskilled sedentary work, except she was limited to lifting and carrying ten pounds occasionally (AR 13). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 77). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff challenges the ALJ's evaluation of the medical evidence with respect to her migraine headaches, first arguing that the ALJ erred in concluding at step two that they were not a severe impairment. *See* [ECF No. 10] pp. 4-7. Step two of the process "determines whether the claimant has a medically severe impairment or combination of impairments." *Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). According to the regulations, "an impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a); *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). Basic work activities are defined as "abilities and aptitudes necessary to do most jobs," including physical functions such as walking; standing; sitting; lifting; pushing; pulling; reaching; carrying and handling; as well as mental functions such as understanding, carrying out, and remembering simple job instructions; use of judgment; responding appropriately to supervision, co-workers

13

and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 416.921(b)(3)-(6).

"The step-two inquiry is a *de minimis* screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). To show that an impairment is severe, however, a claimant must demonstrate "something beyond a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *McCrea*, 370 F.3d at 360 (quotation and citations omitted). The burden of showing that an impairment is severe rests with the claimant. *Bowen*, 482 U.S. 146 n.5.

In concluding that Plaintiff's migraine headaches were not a severe impairment, the ALJ stated:

> The evidence shows the claimant has a history of gastritis, status post cholecystectomy, impaired glucose tolerance, migraine headaches, and non insulin dependent diabetes mellitus. However, progress notes from treating and examining sources generally reveal these conditions are under control with medicaitons (*sic*). In addition, the documentary evidence does not contain any references to limitations as a result of these conditions except for migraine headaches but the state agency consultant noted in June 2009 the claimant had not had a migraine headache requiring medical attention in more than a year (Exhibit 14F). Therefore, these conditions do not have more than a <u>de</u> <u>minimis</u> affect (*sic*) on the claimant's ability to perform basis work activities and are not "severe" disabling impairments as defined in SSRs 85-28 and 96-3p and 20 CFR § 916.920(c).

(AR 10).[4]

A review of the pertinent medical records reveal the following: Plaintiff has alleged disability since December 8, 2008, and had been treating for headaches with Dr. Hall since May 2005 (AR 223). At her initial visit with Dr. Hall, Plaintiff reported suffering from two to three headaches per week causing nausea, lightheadedness, shakiness and irritability (AR 223). Dr. Hall diagnosed Plaintiff with migraine headaches and prescribed medication (AR 223). In March 2006, Dr. Hall reported that Plaintiff had been prescribed a number of medications which

---

[4] Plaintiff does not challenge that ALJ's step two conclusions with respect to her other impairments.

14

had not been effective in improving her symptoms (AR 219). By July 2006, Plaintiff reported that her headaches were tolerable (AR 217). No further complaints relative to headaches appear in the record until almost three years later, when Plaintiff complained of a migraine headache to her chiropractor in May 2009 (AR 270).

Thereafter, in August 2009, Plaintiff reported to Dr. Hall that her headaches had returned, and Dr. Hall prescribed medication (AR 355). Plaintiff's headache complaints resurfaced in March 2010, when she complained to Dr. Tandon that she experienced headaches two times per week (AR 373). Plaintiff further complained to Dr. Hall in April 2010 that her headaches had "become a problem" and Dr. Hall prescribed medication and referred her to a neurologist (AR 350). She also complained of headaches when seen by Dr. Tandon in July 2010 (AR 370).

When seen by Dr. Palatna, her neurologist, on July 16, 2010, Plaintiff reported suffering from two to three headaches per week with associated nausea, photosensitivity, and at times, bilateral hand and feet paresthesias (AR 384). Dr. Palatna diagnosed Plaintiff with classic migraine headaches with aura (AR 386). In a follow-up report dated July 26, 2010, Dr. Palatna stated:

> This poor woman suffers from severe headaches which are throbbing, pulsating character (*sic*) accompanied by nausea, photosensitivity and she needs to spend sometimes up to a couple of days in bed due to her headaches.

(AR 383). She recommended a new treatment regimen in order to address the migraine problem (AR 383). In addition, Dr. Palatna and Dr. Hall provided medical source statements in August 2010 and September 2010 respectively, stating that Plaintiff suffered from headaches several times per week of several hours duration, and opined that she was unable to work while experiencing a headache (AR 399; 401).

In sum, the ALJ's conclusion that Plaintiff's migraine headaches did not represent a severe impairment at step two is not supported by substantial evidence. While Dr. Mortimer, the state agency physician, noted in June 2009 that Plaintiff had not required medical attention for her migraines in over a year, that observation was made prior to Plaintiff's renewed migraine complaints and subsequent treatment with Drs. Hall and Palatna. Moreover, the ALJ's

15

conclusion that her migraines were "generally … under control with medica[ti]ons" (AR 10) is inconsistent with the medical record which reveals periodic but continuing complaints.

Any error in the step two determination may be rendered harmless, however, where an ALJ proceeds with the sequential evaluation process and considers the impact of all of a claimant's impairments in fashioning his or her residual functional capacity ("RFC"). *See, e.g., McCartney v. Comm'r of Soc. Sec.*, 2009 WL 1323578 at *16 (W.D.Pa. 2009) (error harmless where ALJ considered all of claimant's impairments in determining his residual functional capacity); *Lee v. Astrue*, 2007 WL 1151281 at *3 n.5 (E.D.Pa. 2007) (noting that ALJ's step two determination would not warrant remand where the ALJ proceeded with the five step sequential evaluation process and analyzed the claimant's limitations, considering both severe and non-severe). Here, however, the ALJ's error cannot be considered harmless because he did not include any functional limitations related to Plaintiff's migraine headaches in his RFC assessment.

The ALJ rejected the opinions of Drs. Hall and Palatna relative to Plaintiff's migraine headaches, stating:

> The evidence shows that the claimant carries a myriad of diagnosis which taken alone or as a whole do not create such severe symptoms as to make the claimant unable to engage in sustained gainful activity (Exhibits 1F, 2F, 3F, 6F, 7F, 8F, 9F and 11F). The claimant's treating doctors opine the claimant is able to work but not when she is experiencing a migraine headache (Exhibits 7F, 8F, 12F and 13F). However, the diagnostic imaging of the brain was unremarkable and progress notes from her treating physicians reveal her cranial nerves are intact (Exhibits 4F, 6F and 11F).
>
> • • •
>
> To the extent the opinion of Dr. Hall offered in September 2010 supports the finding that the claimant is capable of work at the sedentary exertional level the undersigned assigns this opinion weight; however, to the extent the opinion states the claimant is unable to work the undersigned assigns this opinion very little weight (Exhibit 13F). Finally, the undersigned has considered the opinion of Dr. Palatna, in August 2010, that the claimant had no capacity to work due to pain but also that the claimant experienced only moderate pain, and due to this discrepancy assigns this opinion very little weight (Exhibit 12F). This opinion is not well

> supported by clinical and objective findings, appears to be based predominantly upon the claimant's subjective complaints of symptoms, and is not consistent with the substantial evidence of record. Finally the determination of disability is reserved to the Commissioner.

(AR 14-15). Plaintiff argues that the ALJ erred in "substituting his own opinions for those of trained medical professionals." [ECF No. 10] p. 7. We agree.

The Third Circuit has repeatedly held that "[a] cardinal principle guiding disability determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994). A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. § 416.927(d)(2). In choosing to reject a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (holding that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence" not "simply by having the administrative law judge make a different judgment"); *Moffat v. Astrue*, 2010 WL 3896444 at *6 (W.D.Pa. 2010) ("It is axiomatic that the Commissioner cannot reject the opinion of a treating physician without specifically referring to contradictory medical evidence."). Finally, where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."); *Cotter v. Harris*, 642

F.2d 700, 705-07 (3d Cir. 1981) (without an adequate explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.").

The ALJ discredited the opinions of Dr. Hall and Dr. Palatna primarily on the basis they were unsupported by the clinical and/or objective findings. As set forth above, the ALJ cited to Plaintiff's "unremarkable" brain MRI and her "intact" cranial nerves (AR 14). The ALJ further rejected Dr. Palatna's opinion because it "appeared" to be based predominantly on Plaintiff's subjective complaints (AR 15). The ALJ's conclusion that the above evidence contradicted Plaintiff's treating physicians' opinions is the type of speculation and/or lay opinion precluded by the case law. *Plummer*, 186 F.3d at 429. As this Court has previously pointed out, an ALJ is precluded from pitting "his own expertise against that of" the treating physician, *see Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985), and "cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so." *Layton v. Astrue*, 2010 WL 521190 at *9 (W.D.Pa. 2010) (citing *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007).

Numerous courts have recognized that migraine headaches "cannot be detected by imaging techniques, laboratory tests, or physical examination." *Abbruzzese v. Astrue*, 2010 WL 5140615 at *7 (W.D.Pa. 2010); *Parsley v. Astrue*, 2009 WL 1940365 at *4 (W.D.Pa. 2009) (noting that migraine headaches "do not stem from a physical or chemical abnormality which can be detected by imaging techniques or laboratory tests"), citing *Diaz v. Barnhart*, 2002 WL 32345945 at *6 (E.D.Pa. 2002) (same); *Strickland v. Barnhart*, 107 Fed. Appx. 685, 689 (7th Cir. 2004) (noting that "nothing in the record suggests [neurological] tests can either confirm the existence of migraines or there likely severity" and the treating physician's conclusion that the claimant suffered from severe migraines "even in the face of normal test results shows that there are no diagnostic tests that work particularly well for migraines."); *Federman v. Chater*, 1996 WL 107291 at *2 (S.D.N.Y. 1996) (noting that because there is no test for migraine headaches, " 'when presented with documented allegations of symptoms which are entirely consistent with the symptomatology for evaluating the claimed disorder, the Secretary cannot rely on the ALJ's rejection of the claimant's testimony based on the mere absence of objective evidence.' ") (citations omitted). "Doctors diagnose migraines when symptoms are typical and results of

18

physical examination (which includes a neurologic examination) are normal. No procedure can confirm the diagnosis." *Abbruzzese*, 2010 WL 5140615 at *7 (quoting www.merckmanuals.com/home.

We find the ALJ erred in rejecting Drs. Hall and Palatna's opinions concerning the Plaintiff's migraines based on the lack of objective tests confirmatory of the same. Due to the ALJ's error at step two, and because the ALJ's reasons for rejecting the treating physicians' opinions were not supported by substantial evidence, a remand is required. On remand, the ALJ is directed to reconsider the weight to be accorded the treating physicians' opinions consistent with the previously described case law, and then reevaluate whether Plaintiff's limitations resulting from her migraine headaches impact her ability to perform substantial gainful activity.[5]

## V. CONCLUSION

For the reasons discussed above, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.[6] An appropriate Order follows.

---

[5] Plaintiff also challenges the ALJ's credibility determination. In light of the errors identified above, it is anticipated that the ALJ will necessarily reevaluate Plaintiff's credibility on remand.

[6] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3rd Cir. 2010).

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JESSICA SALBERG,            )
                            )
    Plaintiff,          )      Civil Action No. 11-175 Erie
                            )
  v.                        )
                            )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security, )
                            )
    Defendant.          )

## **ORDER**

AND NOW, this 27th day of August, 2012, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF No. 9] is DENIED, and the Defendant's Motion for Summary Judgment [ECF No. 11] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is directed to mark the case closed.

                                              s/ Sean J. McLaughlin
                                                United States District Judge

cm:    All parties of record